UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMERICAN HOME MORTGAGE CORP, d/b/a/           :
American Brokers Conduit and d/b/a/ HLB Mortgage,
                                              :
                Plaintiff,                     06 Civ. 0668 (AJP)
                                              :
       -against-                                  **OPINION AND ORDER**
                                              :
MORTGAGE GOLD, INC.,
                                              :
                Defendant.
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff American Home Mortgage Corp., d/b/a American Brokers Conduit and HLB Mortgage ("American Home"), brings this diversity action against defendant Mortgage Gold, Inc. ("Mortgage Gold") for breach of contract and fraudulent misrepresentation. (Dkt. No. 1: Compl.) Presently before the Court are the parties' cross-motions for summary judgment. (Dkt. Nos. 33, 44.) The parties have consented to decision of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 32.)

        For the reasons set forth below, both parties' motions are DENIED, and the case will proceed to trial before a jury. The parties are to submit the Joint Pretrial Order by May 18, 2007.

**FACTS**[1/]

**The Broker Agreement**

Plaintiff American Home "is in the business of funding residential mortgage loans." (Dkt. No. 42: Pl. Rule 56.1 Stmt. ¶ 1; Dkt. Nos. 35-41: Goodman Aff. Ex. H: Kalas Aff. ¶ 2.)[2/] On November 6, 2003, American Home and defendant Mortgage Gold entered into a "Mortgage Broker Loan Application Package Submission Agreement" (the "Broker Agreement"). (Dkt. No. 44: Conway Aff. Ex. B: Broker Agmt.; see also Dkt. Nos. 42 & 52: Pl. & Def. Rule 56.1 Stmts. ¶ 3.) Under the Broker Agreement, American Home was to accept from Mortgage Gold "on a non-exclusive basis, application packages for one to four family, cooperative and condominium first and second lien residential mortgage loans." (Broker Agmt. ¶ 1(a).)

Paragraph 9 of the Broker Agreement provides:

[Mortgage Gold] represents, warrants and covenants to [American Home] that in connection with each Application Package as of the date it submits the Application Package to [American Home] and as of the date that the Mortgage Loan is closed:

> a.   All signatures, names, addresses, amounts, credit information, property appraisal, and other statements of fact contained in and associated

---

[1/]  Because the Court is denying the cross-motions, the facts will only be briefly summarized.

[2/]  For many of the factual statements in support of its summary judgment motion, American Home has relied on the March 27, 2006 declaration of its Deputy General Counsel and Chief Compliance Officer, John J. Kalas, which it had originally filed in support of its earlier summary judgment motion. (See Kalas Aff.; Pls. Rule 56.1 Stmt.) The parties thereafter stipulated that Kalas is not to be used as a witness in this matter. (Dkt. No. 56: Def. Objection to Evidence: Ex. A: 1/3/07 Stip. Ltr. at 2.) Therefore, exhibits that rely solely on Kalas' declaration for authentication are inadmissable. In this opinion, the Court references facts from Kalas' declaration and attached exhibits either because they merely provide background, because those facts are supported by other submitted evidence, or because the Court presumes that plaintiff will be able to provide this evidence through competent witnesses at trial.

>   with the Application Package are complete, accurate, true, correct and genuine, in all material respects;
>
>   . . . .
>
>   e.  [Mortgage Gold] took the loan application and fully processed the Application Package itself.

(Broker Agmt. ¶ 9(a), (e).)

Paragraph 6 of the Broker Agreement provides:

> [American Home] will review and act upon each application package submitted by [Mortgage Gold] provided that all documentation required pursuant to this Agreement is included in the submission.  [American Home] will assume all underwriting risk, provided that [Mortgage Gold] shall be solely responsible for the accuracy, truthfulness and completeness of all information supplied to [American Home] in connection with any application.  Without limiting the foregoing, [Mortgage Gold] shall be responsible for any and all fraud known to [Mortgage Gold], and any and all fraud that [Mortgage Gold] reasonably should have known of, that is committed in connection with an Application Package.  Decisions to grant or deny a loan will be solely at the discretion of [American Home].

(Broker Agmt. ¶ 6.)  Paragraph 11 of the Broker agreement provides in part:

> [Mortgage Gold] agrees to indemnify, defend, and hold [American Home] harmless from all loss, damage, cost, or expense resulting from failure of [Mortgage Gold], its directors, officers, agents, or employees to comply with the warranties, representations, and covenants of [Mortgage Gold] in this Agreement, the inaccuracy of any warranties or representations of [Mortgage Broker] in this Agreement and any and all fraud known to [Mortgage Gold], and any and all fraud that [Mortgage Broker] reasonably should have known of, that is committed in connection with an Application Package.

(Broker Agmt. ¶ 11.)  The Broker Agreement is governed by New York law.  (Broker Agmt. ¶ 21.)

**The Szymusiuk Loan**

According to Kalas's affidavit (see footnote 2 above), "[o]n or about May 27, 2004, American Home funded a mortgage loan for an individual identified as Mariusz Szymusiuk in the

4

principal amount of $264,000." (Dkt. Nos. 35-41: Goodman Aff. Ex. H: Kalas Aff. ¶ 6.) The mortgage loan application package purportedly was originated by defendant Mortgage Gold. (Kalas Aff. ¶ 6.) The mortgage loan was "secured by a mortgage on property located at 1634 West 69th Street in Chicago, Illinois." (Kalas Aff. ¶ 6.) In approving the mortgage loan, American Home relied in part on an appraisal, purportedly prepared by Appraisal Services Group, that was contained in the loan application package and appraised the subject property as having a fair market value of $330,000. (Kalas Aff. ¶ 7 & Ex. B.)

When Szymusiuk defaulted on American Home's mortgage loan, American Home foreclosed on the property and sold it for "less than $57,000." (Kalas Aff. ¶ 8; see Dkt. No. 34: Hardman Aff. ¶¶ 4, 7.) During the course of the foreclosure, American Home discovered that the Appraisal Services Group appraisal was fraudulent. (Kalas Aff. ¶ 9.) The initial appraisal described the property as a residential property worth $330,000. (Kalas Aff. ¶ 7 & Ex. B.) A subsequent appraisal revealed the property at 1634 West 69th Street to be a piece of boarded up commercial property, "in poor condition and in need of repair, [that] is located in a high crime area, and worth significantly less than the value set forth in the Appraisal." (Kalas Aff. ¶ 9 & Exs. C, D.)

"American Home initially filed suit against Appraisal Services Group in connection with the fraudulent appraisal. Appraisal Services Group represented to American Home that it did not prepare the Appraisal, that the Appraisal was a forgery, and the Appraisal Services Group had been the victim of professional identity theft." (Kalas Aff. ¶ 10 & Exs. E-G.) "Once American Home determined that Appraisal Services Group was not responsible for the fraudulent appraisal,

but was the victim of professional identity fraud, American Home voluntarily dismissed the action against it." (Kalas Aff. ¶ 11 & Ex. H.)

American Home sued Mortgage Gold for breach of the Broker Agreement and fraudulent misrepresentation. (Dkt. No. 1: Compl.) American Home asserts that its total economic loss resulting from Mortgage Gold's alleged breach of the Broker Agreement in relation to the failed Szymusiuk loan is $234,749.43. (Dkt. No. 34: Hardman Aff. ¶ 8 & Ex. A.)

**Mortgage Gold**

Aleksandar Panovich is the President and sole owner of Mortgage Gold. (Dkt. Nos. 35-41: Goodman Aff. Ex. D: Panovich Dep. 26-27; Dkt. No. 44: Panovich Aff. ¶¶ 2-3.) "Mortgage Gold originates and takes loan applications for residential mortgages in the state of Illinois," but does not fund or act as a lender for any of these mortgages. (Panovich Dep. 27.) Mortgage Gold frequently receives mortgage loan application referrals from outside individuals, and usually pays the individuals a percentage of the commission that Mortgage Gold receives from lenders as a referral fee. (Panovich Dep. 33-36.) The amount of the referral fee is negotiated separately with each individual, and is usually done via an oral agreement, but not with a written contract. (Panovich Dep. 35-36.)

Once it receives a mortgage loan application, Mortgage Gold refers it to one of approximately fifty lenders with which it has a relationship. (Panovich Dep. 37.) Most of those lenders have a contractual relationship with Mortgage Gold. (Panovich Dep. 37-38.) Those contracts typically require that Mortgage Gold itself originate and broker each mortgage loan application. (Panovich Dep. 38.)

**Mortgage Gold's Relationship with Mark Genovese**

In December 2003, Panovich began a business relationship with Mark Genovese. (Dkt. Nos. 35-41: Goodman Aff. Ex. D: Panovich Dep. 41-42.) Genovese was not an employee of Mortgage Gold. (Panovich Dep. 41.) During December 2003 through January 2004, Genovese referred approximately two to four mortgage loan applications to Mortgage Gold. (Panovich Dep. 41-42; Dkt. Nos. 42 & 52: Pl. & Def. Rule 56.1 Stmts. ¶¶ 16, 17, 19.) According to Panovich, Genovese was supposed to refer these mortgage loan applications to Mortgage Gold, and then Panovich would put the application in his own name and submit it to a lender. (Panovich Dep. 42-43;.) However, Genovese submitted these two to four mortgage loan applications directly to the loan companies, and only told Panovich about them afterward. (Panovich Dep. 42-43; see Pl. & Def. Rule 56.1 Stmts. ¶¶ 19-20.) In his deposition, Panovich remembered that these loans were funded, but could not remember which companies funded them. (Panovich Dep. 43.) Panovich never received copies of the mortgage loan application paperwork for those loans, and never contacted the funding companies to tell them that Genovese had not gone through Mortgage Gold for these loan applications. (Panovich Dep. 43-44.) Panovich received a check from the title company for those loans in the amount of the broker premium, and gave a portion of that amount to Genovese. (Panovich Dep. 44-45.) Panovich did not specifically recall anything about those loans and did not have copies of the paperwork from the title company or of the checks. (Panovich Dep. 44-45.) Panovich explained that he did not have a specific system for keeping track of broker premium checks; instead, if a check came in from a title company, he would deposit it. (Panovich Dep. 49-50.) Panovich explained that Mortgage Gold was a "small mom and pop shop" where the file system

was relatively informal.  (Panovich Dep. 49-50.)  Panovich explained that even though Genovese did not submit the mortgage loan applications the right way, he paid Genovese the referral fees because Panovich "didn't think [he] would have to deal with [Genovese] again." (Panovich Dep. 56.)

After those initial loans, Genovese did not refer any more loans to Mortgage Gold because Panovich told Genovese that he could not submit loan applications directly to lenders, and instead they first had to be processed through Mortgage Gold.  (Panovich Dep. 45-46, 58; Pl. & Def. Rule 56.1 Stmts ¶¶ 25-26.)  Panovich testified that Genovese told him that was "no problem." (Panovich Dep. 52-53; Pl. & Def. Rule 56.1 Stmts ¶¶ 25-26.)  Panovich testified that he only had a "small concern" that the loans that Genovese had submitted directly to the lenders would come back and hurt Mortgage Gold because Panovich knew that the loans would have had to go through a quality control process at the lender involving at least two lawyers, the title company, the lender underwriter, the appraiser, and the closing department.  (Panovich Dep. 56, 86-87.)

In March 2004, when looking at the ABN Amro website, Panovich became aware of seven or eight loans under Mortgage Gold's file that he did not recognize.  (Panovich Dep. 58-61.) Panovich called Genovese to see if Genovese was using his license to broker these loans, but Genovese denied doing so.  (Panovich Dep. 61-62.)  Panovich never received broker premium checks for these loans.  (Panovich Dep. 62-63.)  Panovich tried to contact the title company, but it never got back to him.  (Panovich Dep. 63-64.)  Panovich also called certain contact people at some of the lenders with whom he had a longstanding relationship to let them know that they should watch out for any mortgage loans coming in from Mortgage Gold that had Genovese's name on them because he believed that Genovese was the person who originated these loan applications.  (Panovich

Dep. 66-68.)  One of the people that Panovich called to warn about Genovese was Cissy Larkin, his contact person at American Home.  (Panovich Dep. 66-68.)

Sometime after March 2004, Genovese called Panovich and told him that he had more referrals for Mortgage Gold, and Panovich told him again that the only way he could do anything was to go through Panovich and Mortgage Gold.  (Panovich Dep. 68.)  Panovich testified that he felt "stupid" now for ever being willing to do business with Genovese.  (Panovich Dep. 69.)  Genovese never brought any referrals to Mortgage Gold after that call.  (Panovich Dep. 69.)  However, sometime prior to October 2004, Genovese came to Panovich with a closing statement and asked for his commission.  (Panovich Dep. 72-73.)  Panovich was "livid" and "very upset with him," told Genovese it was "the last straw," and said "this is three strikes you're out." (Panovich Dep. 73, 78-79, 86.)  Panovich paid Genovese the commission and kept a portion for Mortgage Gold because he "wanted to get him out of [his] life." (Panovich Dep. 73, 86.)  Panovich was not sure if this loan was the Szymusiuk/American Home loan; he did not call American Home because he did not feel the need to call because he had already spoken to their representative Cissy Larkin in March 2004 to tell her to watch out for Genovese.  (Panovich Dep. 73-74.)  Panovich did not keep files tracking loan referrals for this time period.  (Panovich Dep. 91-92.)

Panovich testified that in the normal course of submitting loan applications to lenders, he would not normally take any extra steps to verify that an appraisal was authentic.  (Panovich Dep. 98-99.)  Panovich had not heard of Appraisal Group Services before.  (Panovich Dep. 101.)

Sometime around September or October 2004, Cissy Larkin of American Home called Panovich to tell him that Mortgage Gold was suspended with American Home until further

notice because of a bad loan wherein the borrower had stopped making payments to the lender. (Panovich Dep. 70-71, 79-81.) Panovich told Larkin he would try to help American Home as much as he could. (Panovich Dep. 81.) Panovich called Genovese to ask him about that loan. (Panovich Dep. 77.) Genovese told Panovich he would check to see if it was one of his loans, but Panovich never spoke to Genovese again. (Panovich Dep. 78.)

Panovich testified that he and Larkin had several conversations about this loan in which Larkin asked Panovich to provide as much information to American Home as he could, and she would try to get him re-approved to do business with them. (Panovich Dep. 81-84.) Larkin told Panovich that American Home was suing the appraisal company in connection with the bad loan. (Panovich Dep. 83-84.) Larkin eventually forwarded Panovich a copy of the Szymusiuk loan materials submitted by Genovese. (Panovich Dep. 85.)

Panovich testified that once he reviewed the loan materials that Genovese submitted to American Home, he noted that there were several inconsistencies that he characterized as "red flags" on the loan application. (Panovich Dep. 159.) The loan application referred to the broker company as "Gold Mortgage," with an address in Aurora, Illinois, even though Mortgage Gold never had an office in Aurora, Illinois. (Panovich Dep. 159-60.) The credit report submitted with the loan application was not provided by Mortgage Gold, which, according to Panovich, was very unusual because industry standards require the mortgage broker to supply the credit report. (Panovich Dep. 161-62.) Panovich also testified that it was routine for a lender to fax a loan verification to the mortgage broker when it was approved or denied, but that Mortgage Gold never received a fax

regarding the loan application that Genovese sent to American Home for the Szymusiuk property. (Panovich Dep. 162-63.)

On November 9, 2005, Panovich wrote a letter to American Home's lawyers in an attempt to help them pursue a case against Genovese, which read as follows:

> Enclosed please find all the documentation that I have on this file, I never saw the file nor did I know who did the appraisal, I barely knew the loan officer Mark Genovese.
>
> To give you a history of how Mark Genovese came to do loans at Mortgage Gold, I was approached by Mark Genovese on or about November 2003. He came to me on a reference from my old boss at Mid America Bank Jeff Kanney. Mark wanted to run some loans through my company and he would pay me $500.00 per file, the agreement was that I was supposed to see every file before it was presented to underwriting which never happened. Mark did two loans in December 2003 which I had payed him on, I never saw any of the loans Mark did because he dealt directly with the lender and processed his own files, he would just show me a RESPA and I would pay him.
>
> Starting in January of 2004 I lost track of Mark[.] And did not here [sic] from him until March, but between January and March I found out that he was somehow closing loans under my license and cashing the checks, it turned out to be about seven or eight files. I finally caught up with him and I told him to stop using my license. He said he would but he just wanted to do a couple of more files so he could pay me the money he owes me. In the mean time I find out one of his neighbors Anu Kaandai acted as a loan officer on one of the loans that I never knew about, Anu claimed that Mark never paid him, $3063.00. I promised Anu that I would pay him out of Mark's last loan.
>
> Mark subsequently originated the loan in question and had it appraised and sent it to HLB (American Home Mortgage Group). I never saw the file, I had no idea at the time who appraised the home, and the only document I saw was the RESPA that Mark showed me so that I could pay him. I wanted to pay him, pay Anu what Mark owed him and keep the rest of the commission for what Mark owed me, and get Mark out of my life.
>
> A few months later I was contacted by Cissy Larkin from HLB (American Home Mortgage Group) who was the branch manager, she told me what had happened. I immediately tried to get in contact with Mark Genovese, I called Jeff

>       Kanney who had referred Mark to me and Mark called me back and promised to help out in any way.  I asked Mark to send me a copy of the file which I hadn't seen, he said he would, after about six weeks or so I never received anything.  It was late January 2005, I had tried numerous times to contact Mark, and he wouldn't respond. . . .  I have since never been able to find Mark Genovese.  Enclosed please find Mark's 1099 his SS#, stubs from the checks to Mark and Anu and my bank statement that shows the 5/28/04 deposit of commis[s]ion's [sic] from the loan in question.  This basically is a story of a rogue loan officer who took advantage of my mortgage license for his own gain.
>
>       I have originated and closed numerous loans through HLB (American Home Mortgage Corp) all of my loans are performing and I have never had a problem.  I have had my mortgage license for ten years and I have been in the mortgage business for seventeen years and I have never had a problem of any kind until the name Mark Genovese came into my life.  If there is any other way I can be of help please let me know.  If you have any further questions please feel free to call me at the above number.

(Dkt. Nos. 35-41: Goodman Aff. Ex H: Kalas Aff. Ex. I: 11/9/05 Panovich Ltr.)

Although Panovich conceded at his deposition that he wrote and signed this letter (Panovich Dep. 105-06), he claimed that it was based in part on information he had received from Cissy Larkin and American Home's attorney.  (See Panovich Dep. 106-26; see also Dkt. No. 62: Mortgage Gold's Further Objections to Evidence, at 2.)  The letter, and Panovich's disclaimer of certain of the facts he asserted in the letter, raises a material issue for trial.  (See page ___ below.)

**Procedural History**

On January 27, 2006, plaintiff American Home filed its complaint.  (Dkt. No. 1.)  On February 21, 2006, defendant Mortgage Gold moved to dismiss the complaint for lack of jurisdiction and moved in the alternative to transfer venue.  (Dkt. No. 5.)  On March 27, 2006, American Home cross-moved for summary judgment.  (Dkt. No. 9.)  On July 7, 2006, Judge Koeltl denied Mortgage Gold's motion to dismiss or to transfer venue, and denied American Home's cross-motion for summary judgment.  (Dkt. No. 22.)  On December 20, 2006, the parties consented to decision of the

case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 32.)  On February 2, 2007, both parties cross-moved for summary judgment.  (Dkt. Nos. 33, 44.)

## ANALYSIS

### I.     SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  Instead, the non-moving

party must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (At summary judgment, "[t]he time has come . . . 'to put up or shut up.'") (citations omitted), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[3/]  The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To evaluate a fact's materiality, the substantive law determines which facts are critical and

---

[3/]   See also, e.g., Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

14

which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. United States Fire Ins. Co., 804 F.2d at 11-12.

## II. PLAINTIFF'S AND DEFENDANT'S CROSS-MOTIONS FOR SUMMARY JUDGMENT ARE DENIED BECAUSE TRIABLE ISSUES OF MATERIAL FACT EXIST

Plaintiff's and defendant's cross-motions for summary judgment are denied because there exist disputed issues of material fact.  The Court need not, and will not, identify all such disputes, but merely highlights a few.

The most important dispute centers on Panovich's November 9, 2005 letter.  The letter admits that Genovese originated the Szymusiuk loan at issue; admits that Genovese submitted the loan application package to American Home as a Mortgage Gold originated loan; and further admits that Mortgage Gold received a commission on the loan and paid Genovese a share of the commission. (See page ___ above.)  Panovich claims, however, that he based the information in the letter on what American Home's employee and counsel had told him, and that he does not know whether what he wrote is what happened.  (See page ___ above.)  A reasonable jury could believe that Panovich's letter was based on his own personal knowledge and that his subsequent denial is an attempt to avoid liability.  Conversely, a reasonable jury could accept Panovich's explanation for the letter, which would require American Home to prove these facts through other admissible evidence.

As another example, in the absence of the admission in the Panovich letter, it is unclear whether American Home can prove that the Szymusiuk loan package was submitted by Genovese and, if so, whether it was submitted as a "Mortgage Gold" submission.[4/]  American Home will need to prove this at trial either directly and/or through the Panovich letter.

Furthermore, for its "ratification" argument, in the absence of the admission in the Panovich letter, American Home will need to prove that Mortgage Gold received a commission on the Szymusiuk loan and paid some of that commission to Genovese.  Panovich's deposition testimony on this issue was vague – he testified that he received a commission and paid part of it to Genovese, but that he was not sure if it was for the Szymusiuk loan in issue.  A reasonable jury could infer from the timing of the payments, and from Panovich's vagueness and failure to keep records, that the commission was for the loan in issue.

The absence of direct proof on some of these issues might have provided a basis for Mortgage Gold's cross-motion for summary judgment, but the Panovich letter and the vagueness of Panovich's deposition testimony (and his failure to keep business records) precludes summary judgment for Mortgage Gold.  On the other hand, the dearth of direct proof and Panovich's deposition "disclaimer" of the admissions in his letter preclude summary judgment for American Home.  We have jury trials to resolve material fact disputes like those involved in this case.[5/]

---

[4/]    Notably, neither party submitted the entire Szymusiuk mortgage loan application as evidence in support of the summary judgment motions.

[5/]    Because the Broker Agreement provides that the prevailing party is entitled to attorneys' fees (Broker Agmt. ¶ 21), the Court strongly urges the parties to settle this case before trial.

## **CONCLUSION**

For the reasons set forth above, neither plaintiff nor defendant is entitled to summary judgment. Both parties' motions therefore are DENIED.

The parties are to submit the Joint [Proposed] Pretrial Order by May 18, 2007. Counsel shall contact my chambers for a copy of my pretrial order requirements.

DATED:  New York, New York
        April 18, 2007

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies to:  Stephen F. Ellman, Esq.
            Bruce S. Goodman, Esq.
            Michael T. Conway, Esq.
            Robert Ostojic, Esq.